UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
CLAUDIA LUCERO, MAGDALENA L. ROJAS, OLGA
SAAVEDRA, and MARIA DEL CARMEN SILVA
on behalf of themselves, and those similarly situated,

                Plaintiffs

      v.

PAPA HOTEL CORP. (d/b/a JETSET HOTEL and
d/b/a METRO SUITES HOTEL),
MANNY CHADHA and PARAS CHADHA
in their individual and professional capacities,


              Defendants, jointly and severally,

--------------------------------------------------------------------------------x

**Index No.**

**PLAINTIFFS'
COMPLAINT**

**WITH JURY DEMAND**


## NATURE OF THE ACTION

Plaintiffs CLAUDIA LUCERO, MAGDALENA L. ROJAS, OLGA  SAAVEDRA, and MARIA
DEL CARMEN SILVA, (hereafter "Plaintiffs") by and through undersigned counsel Kristina
Mazzocchi, Esq. PLLC, on behalf of themselves bring this action against Defendants PAPA
HOTEL CORP. (d/b/a JETSET HOTEL and METRO SUITES HOTEL), MANNY CHADHA and
PARAS CHADHA in their individual and professional capacities, (collectively "Defendants"),
and upon personal knowledge as to themselves and upon information and belief as to other matters,
allege as follows:

1. Approximately 25 to 85 percent of working women have experienced sexual harassment

    or abuse in the workplace.[1] Nearly 90% of hotel housekeeping in the U.S. are women. A

    vast majority of these are women of color and immigrant women.[2] Immigrant women

    workers, especially those within these hidden-by-design workforces, like Plaintiffs herein,

    are particularly vulnerable to exploitation such as low pay, wage-theft, discrimination,

---

[1] https://www.eeoc.gov/select-task-force-study-harassment-workplace

[2] https://www.legalvoice.org/post/2018/04/25/standing-with-seattle-hotel-workers-in-the-fight-against-workplace-sexual-violence

physical and sexual harassment in the workplace.[3]  One study revealed that 58 percent of hotel workers — who often work alone — reported experiencing sexual harassment from a guest, ranging from men exposing themselves or answering the door naked to outright assault.[4] A concern that has been validated by bills being introduced and/or passed in California and our neighboring state of New Jersey that provide panic buttons for housekeepers and blacklist certain hotel guests accused of assault.[5] These statistics do not include instances where workers have been subject to such exploitation yet for obvious reasons having to do with precarity based on immigration status do not report.

2. This action centers around four female Plaintiffs who are of Hispanic, Indigenous Mexican National Origin and are actual or perceived immigrants (hereafter referred to collectively as "immigrants and/or protected status" to denote all such statuses or any combination thereof) hired at various times directly by Defendants to work as full-time housekeeping employees of PAPA HOTEL CORP. (d/b/a JETSET HOTEL and METRO SUITES HOTEL) (hereafter "Defendant Hotels") between the years of on or about April 2010 to on or about September 2021.

3. Defendants own, operate and/or manage a portfolio of cash only hourly "hotels" in the Bronx, New York. Upon information and belief, Defendants are allegedly largely dependent on a clientele who use their hotel rooms to engage in illicit activities including drug use, prostitution and for other such uses.

4. This is an action brought to remedy an egregious case of a continuous sexually and racially hostile work environment, discrimination in employment on the basis of sex, race, national

---

[3]https://www.researchgate.net/publication/312874799_Perceived_workplace_mistreatment_Case_of_Latina_hotel_h ousekeepers
[4] https://news.bloomberglaw.com/safety/panic-buttons-could-sound-the-alarm-on-hotel-worker-assaults-corrected
[5] https://news.bloomberglaw.com/safety/panic-buttons-could-sound-the-alarm-on-hotel-worker-assaults-corrected

origin, and retaliation for protected activities in violation of New York Exec. §290 et. seq.,

and New York City Administrative Code §§8- 101 et. seq. ("NYCHRL") seeking monetary,

declaratory and injunctive relief.

5. Plaintiffs also bring this action to recover minimum wage and/or overtime, unlawful

deductions and for failure to provide proper wage notices and wage statements pursuant to

the New York Labor Law ("NYLL"), §§ 650 *et seq.,* and FLSA, 29 U.S.C. § 207.

6. Defendants have deprived Plaintiffs of minimum wage; overtime pay since at least on or

about June 2016 in violation of the New York Labor Law ("NYLL").

7. Defendants have violated notice-and-recordkeeping requirements by failing to provide

statements along with wages listing the name of employee, name of employer, address and

phone number of employees, rate or rates of pay and basis thereof, whether paid by the hour,

shift, day, week, salary, piece, commission, or other, gross wages, deductions, allowances,

if any, claimed as part of the minimum wage, and net wages.

8. Defendants have further violated the requirement that they provide, upon employee request,

explanations of how wages were calculated in violation of NYLL §195(3).

9. Defendants have violated notice-and-recordkeeping requirements by failing to provide

employees with wage notices as required at hire and thereafter every time there was a change

to the applicable minimum wage rate  in violation of NYLL § 195(1).

10. Further, because of their protected status, Plaintiffs were deprived of minimum wage, and

overtime, as well as proper wage notices and wage statements, and subjected to unlawful

deductions pursuant to the New York Labor Law ("NYLL"), §§ 650 *et seq.,* and FLSA, 29

U.S.C. § 207.

11. Indeed, Plaintiffs' perceived immigration status, which coincided with their national origin as Mexican and identity as Hispanic, was used to justify violations of New York Labor Law regarding equal wages, minimum wage and overtime. Plaintiff SILVA recalls upon hire, her boss, Defendant P. CHADHA, exclaimed, "We don't have to pay you minimum wage or overtime because you are undocumented. If you don't like it, leave".

12. Plaintiffs further allege that they were subjected to unhealthy and incredibly unsafe working conditions, which include but are not limited to: continuously being forced to ride in malfunctioning elevators[6], an incredibly dangerous issue known to Management; being exposed to bloodborne pathogens and other potentially infectious materials including bodily fluids, crack pipes, used drug needles and other drug paraphernalia; subjected to bed bugs with no working laundry to deal with such infestations, being denied PPE (even during the pandemic) with no guidance for workplace injury and illness prevention and response.

13. Plaintiffs report being penalized for advocating for safer working conditions. Plaintiff SAAVEDRA described the retaliatory firing she faced on or about September 2020 when raising safety concerns after she was required to call 911 for a coworker who had toxic cleaning chemicals in her eyes. Plaintiff SAAVEDRA was harassed and then fired for her advocacy for this worker.

14. But it was the constant abuse and harassment by Defendants and their clientele that made clear that threats to Plaintiffs' physical and emotional safety were terms and conditions of their job.

---

[6] https://a810-bisweb.nyc.gov/bisweb/PropertyProfileOverviewServlet?boro=2&houseno=4563&street=3rd+avenue&go2=+GO+&requestid=0

## JURISDICTION AND VENUE

15. Jurisdiction is proper as this Court has original federal question jurisdiction under 28 U.S.C. § 1331 since this case is brought under the FLSA, 29 U.S.C. §§201, *et seq.*

16. This Court has supplemental jurisdiction over the NYLL and NYCHRL claims, as they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

17. As stated below, JETSET HOTEL and METRO SUITES HOTEL, are employers engaged in commerce as defined in the FLSA, 29 U.S.C. §203(s).

18. JETSET HOTEL and METRO SUITES HOTEL are subject to personal jurisdiction in the State of New York since it is located and conducts business in Bronx County, State of New York.

19. Defendants MANNY CHADHA and PARAS CHADHA are subject to personal jurisdiction in the State of New York since they conduct business in this state.

20. Venue is proper in this District because Defendants conduct business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

### Plaintiffs

21. Plaintiff CLAUDIA LUCERO ("LUCERO") is a Hispanic female of Mexican National Origin and indigenous ethnicity. She is a resident of Bronx County.  Plaintiff LUCERO was employed by Defendants from on or about July 2016 to on or about September 27,

2021. Throughout Plaintiff Lucero's five-year tenure working for Defendants, she consistently worked approximately five 8-hour shifts for a total of approximately 40 hours a week, except when she worked extra shifts, which she consistently worked approximately twice a month.  At no time was she paid overtime.

22. Plaintiff MAGDALENA L. ROJAS ("ROJAS") is a Hispanic female of Mexican National Origin and indigenous ethnicity. She is a resident of Bronx County. Plaintiff ROJAS was employed by Defendants from on or about April 2010 to on or about September 27, 2021. She worked seven eight-hour shifts, 7 days a week, for a total of fifty-six hours a week. At no time was she paid overtime.

23. Plaintiff OLGA SAVEEDRA ("SAVEEDRA") is a Hispanic female of Mexican National Origin and indigenous ethnicity. She is a resident of Bronx County. Plaintiff SAVEEDRA was employed by Defendants from on or about August 2016 to in or about June 25, 2021. She worked seven eight-hour shifts, 7 days a week, for a total of fifty-six hours a week. At no time was she paid overtime.

24. Plaintiff MARIA DEL CARMEN SILVA ("SILVA") is a Hispanic female of Mexican National Origin and indigenous ethnicity. She is a resident of Bronx County. Plaintiff SILVA was employed by Defendants from on or about June 2017 to on or about June 30, 2021. She worked seven eight-hour shifts, 7 days a week, for a total of fifty-six hours a week. At no time was she paid overtime.

**Defendants**

25. Defendant PAPA HOTEL CORP. is a New York Corporation with multiple locations, doing business as JETSET HOTEL located at 4563 3rd Ave Bronx, NY 10458  and METRO SUITES HOTEL, located at 2327 Bathgate Ave, Bronx, NY, 10458.

26. Defendants are part of a single integrated enterprise that jointly employed plaintiffs at all times relevant to this complaint, as the defendants are engaged in activities performed for a common business purpose as defined by FLSA, 29 U.S.C. § 203(r).

27. Paras Chadha (hereafter "Defendant P. Chadha"), on information and belief is a resident of New York State. Defendant P. Chadha, who at all times relevant to this complaint has been the Chief Executive Officer, was an operator, manager, principle, owner, and an individual engaged in active management of the day-to-day business operations.

28. Manny Chadha (hereafter "Defendant M. Chadha"), on information and belief is a resident of New York State. Defendant, who at all times relevant to this complaint is/was an operator, manager, principle, owner, and an individual engaged in active management of the day-to-day business operations.

29. Each Defendant jointly and severally employed Plaintiffs at all times relevant to this complaint.  Each Defendant has, individually and jointly, at all times relevant herein, exercised and retained control over all aspects of the day-to-day functions of the business, including: (i) operational control over the operational enterprise, including actively managing, supervising, and directing the business operations; (ii) power to establish, and did establish, the terms of employment of Plaintiffs and others similarly situated; (iii) power to hire and fire; (iv) control over employee work schedules; (v) the ability to determine the rate and method of employee compensation; and (vi) employment records of Defendant Hotels.

30. Reference to Defendants throughout this complaint is to all named Defendants unless a particular Defendant is specifically named.

31. Upon information and belief, based on information provided by Plaintiffs, employees of Defendants, PAPA HOTEL CORP is an enterprise whose annual gross volume of sales made, or business done, is in excess of $500,000. Specifically, JETSET alone received two PPP draws totaling approximately $100,000 based on annual payroll expenses in excess of $275,000.[7] Upon information and belief, Papa Hotel Corp. company employs approximately more than 50 workers at any given time.  As such, based on Plaintiffs' personal knowledge and based on public records of Defendants' business, as well as upon information and belief, Defendants are an enterprise engaged in commerce as defined by 29 U.S.C. §203.

32. Defendants are covered employers within the meaning of the 29 U.S.C. §203(d) and NYLL §190.

## COMMON NYLL and FLSA ALLEGATIONS

33. For all of the named Plaintiffs whose individual factual allegations are stated below, (and except those specifically noted) the following common facts apply to each of the named Plaintiffs:

34. Plaintiffs have worked at Defendants' hotels, corporately owned PAPA HOTEL CORP d/b/a JETSET HOTEL and METRO SUITES HOTEL.

35. Plaintiffs have been supervised by owner Defendants Paras Chadha and Manny Chadha.

36. At all times relevant, Plaintiffs were covered employees within the meaning of NYLL and/or FLSA.

37. At all times relevant, Defendants have violated the requirement that they provide accurate pay stubs in their primary language as required under NYLL §195(3) to Plaintiffs and those similarly situated.

---

[7] https://www.federalpay.org/paycheck-protection-program/papa-hotel-corp-bronx-ny

38. Defendants have violated notice-and-recordkeeping requirements by failing to provide employees with wage notices in their primary language as required at hire and thereafter every time there was a change to the applicable minimum wage rate in violation of NYLL § 195(1) including failing to provide such to Plaintiffs.

39. At all times relevant, Plaintiffs routinely worked in excess of 40 hours per week.

40. At various times and for several years of Plaintiffs' tenures, Defendants failed to pay all Plaintiffs in accordance with the minimum wage provisions of FLSA, 29 U.S.C. § 206 and NYLL § 652.

41. At all times relevant, Defendants failed to pay Plaintiffs at the overtime rate for all hours in excess of forty (40) hours per workweek, in violation of the overtime provisions of FLSA, 29 U.S.C. § 207 and NYLL §§650 *et seq.* and regulations promulgated thereunder.

42. At all times relevant,  Defendants failed to provide Plaintiffs with adequate breaks in violation of NYLL §§162 *et seq.*

43. Because Plaintiffs must base their factual allegations on their own recollection, the dates and times of employment are alleged with the qualifications "on or about" and "approximately."

44. Plaintiffs were all paid pursuant to the same policies of Defendants that applied to all similarly situated employees as Plaintiffs with protected status, including: failing to pay overtime; failing to provide wage statements; and failing to provide wage notices, and failing to pay Plaintiffs minimum wage at various times,

45. All Plaintiffs received unpaid "training" time.

46. Defendants committed the acts alleged in this complaint knowingly, intentionally and willfully within the meaning of FLSA, 29 U.S.C. § 216 and NYLL.

47. Defendants knew that the nonpayment of overtime would economically injure plaintiffs and violate federal and New York State laws.

## INDIVIDUAL NYLL and FLSA ALLEGATIONS

**Plaintiff LUCERO**

48. As a housekeeping employee, Plaintiff LUCERO was a covered employee as defined by FLSA, 29 U.S.C. § 203(e) and NYLL § 190; and is not exempt by FLSA, 29 U.S.C. § 213.

49. Plaintiff LUCERO was hired as a housekeeping employee for JETSET in or about July 2016 by Manager Harry.

50. At various times Plaintiff LUCERO performed work not only at JETSET but also at METRO SUITES HOTEL.

51. At all times Plaintiff LUCERO's pay for work performed at both hotels was paid together, including in a single check when she was paid by check, and Plaintiff LUCERO was assigned to work at both hotels by individual Defendants and their agents.

52. Plaintiff LUCERO's first day of "training" consisted of one 8-hour day and was unpaid.

53. For the first four months of her employment, Plaintiff LUCERO worked Saturdays from 11:00pm to 7:00am, and Sundays and Mondays from 3:00pm-11:00pm for a total of 24 hours a week.

54. In this period was paid $9.00 per hour in cash for approximately three to four months until in or around September 2016, when she started to receive payment by check.

55.  Thereafter Plaintiff LUCERO consistently worked approximately five eight-hour shifts for a total of approximately 40 hours a week, except when she received floating shifts, which she consistently worked twice a month.

56. Plaintiff LUCERO's regular schedule was Friday, Saturday and Sunday from 7:00am-3:00pm, and on Monday and Thursday from 3:00pm-11pm, not including her floating shifts.

57. Plaintiff LUCERO's two floating eight-hour shifts were spread out randomly over the month and paid in cash at a straight time rate of the employee Plaintiff Lucero was covering.

58. That is, if the worker who was seeking coverage was paid at the discriminatory and illegal sub-minimum wage rate reserved for immigrant workers, Plaintiff LUCERO would be paid the same rate.

59. At no time was Plaintiff LUCERO paid overtime for her floating shifts and at no time were these extra 16 hours worked per month reflected on Plaintiff LUCERO's pay stub.

60. That is, at all times relevant, when Plaintiff LUCERO was paid by check, she was paid for only 40 hours by check (her floating shifts being paid in cash) and her pay stubs did not reflect her total number of hours worked.

61. At no time until 2020 did Plaintiff LUCERO receive minimum wage.

62. In 2016 Plaintiff LUCERO received a straight time rate of $9.00/hour.  In 2017, she received a straight time rate of $10.50/hour. In 2018, she received a straight time rate of $12.00/hour. In 2019, she received a straight time rate of $13.50/hour, and in 2020 and 2021 she finally was paid minimum wage, receiving a straight time rate of $15.00/hour up.

**Plaintiff ROJAS**

63. As a housekeeping employee, Plaintiff ROJAS was a covered employee as defined by FLSA, 29 U.S.C. § 203(e) and NYLL § 190; and is not exempt by FLSA, 29 U.S.C. § 213.

64. Plaintiff ROJAS was hired as a housekeeping employee for JETSET in or about April 2010 by Manager Manny Chadha.

65. At various times Plaintiff ROJAS performed work not only at JETSET but also at METRO SUITES HOTEL.

66. At all times Plaintiff ROJAS' pay for work performed at both hotels was paid together, and Plaintiff Rojas was assigned to work at both hotels by individual Defendants and their agents.

67. Plaintiff ROJAS' first week of "training" consisted of five 8-hour days and was unpaid.

68. Thereafter Plaintiff ROJAS was paid $7.00 per hour in cash.

69. Throughout Plaintiff ROJAS' 11-year tenure working for Defendants, she consistently worked approximately seven eight-hour shifts for a total of approximately 56 hours a week.

70. Specifically, Plaintiff ROJAS worked five regularly scheduled shifts a week, and two floating shifts, the latter which changed every week.

71. At all times relevant when Plaintiff ROJAS was paid by cash at a straight time rate for all her hours worked.

72. At no time was Plaintiff ROJAS paid overtime for her floating shifts and at no time were these extra 16 hours worked per week reflected on Plaintiff ROJAS' employee records.

73. Plaintiff ROJAS' two floating eight-hour shifts were spread out randomly over the week and paid in cash at a straight time rate of the employee Plaintiff ROJAS was covering.

74. That is, if the worker who was seeking coverage was paid at the discriminatory and illegal sub-minimum wage rate reserved for immigrant workers, Plaintiff ROJAS would be paid the same rate.

75. At no time until 2020 did Plaintiff ROJAS receive minimum wage.

76. In 2016 Plaintiff ROJAS received a straight time rate of $8.00/hour, paid in cash. In 2017, she received a straight time rate of  $9.00/hour cash. In 2018, she received a straight time

rate of $12.00/hour by check. In 2019, she received a straight time rate of $13.50/hour by check. In 2020 and 2021 she received a straight time rate of $15.00/hour by check for her regularly scheduled shifts.

77. At no time was Plaintiff ROJAS paid overtime for her floating shifts.

**Plaintiff SAAVEDRA**

78. As a housekeeping employee, Plaintiff SAAVEDRA was a covered employee as defined by FLSA, 29 U.S.C. § 203(e) and NYLL § 190; and is not exempt by FLSA, 29 U.S.C. § 213.

79. Plaintiff SAAVEDRA was hired as a housekeeping employee for JETSET in or about August 2016 by Manager Harry.

80. At various times Plaintiff SAAVEDRA performed work not only at JETSET but also at METRO SUITES HOTEL.

81. At all times Plaintiff SAAVEDRA's pay for work performed at both hotels was paid together, including in a single check when she was paid by check, and Plaintiff SAAVEDRA was assigned to work at both hotels by individual Defendants and their agents.

82. Plaintiff SAAVEDRA's first week of "training" consisted of four 6-hour days and was unpaid.

83. At no time until 2020 did Plaintiff SAAVEDRA receive minimum wage.

84. After Plaintiff SAAVEDRA's unpaid training, she was paid $9.00 per hour in cash for approximately 4 months until in or around January 2017, when she started to receive payment by check at the straight time of rate of $10.50/hour. In 2018, she received a straight time rate of $12.00/hour. In 2019, she received a straight time rate of $13.50/hour up to 40 hours, in 2020 and 2021 she received a straight time rate of $15.00/hour.

85. For the first three years of Plaintiff SAAVEDRA's employment, from in or around August 2016 to approximately in or around August 2019, she worked seven days a week from 11:00 pm-7:00 am.

86. Then Plaintiff SAAVEDRA's schedule changed to Saturday – Tuesday from 3:00 pm to 11:00 pm and Wednesday-Friday 7:00 am to 3:00 pm.

87. At no time was Plaintiff SAAVEDRA paid overtime and at no time were her 16 hours worked in excess of 40 hours per week reflected on Plaintiff SAAVEDRA's pay stub.

88. At all times relevant, when Plaintiff SAAVEDRA was paid by check, she was paid at a straight time hourly rate by check up to 40 hours, and in cash for her additional 16 hours worked weekly.

89. That is, at all times relevant, Plaintiff SAAVEDRA's pay stubs did not reflect her total number of hours worked.

**Plaintiff SILVA**

90. As a housekeeping employee, Plaintiff SILVA was a covered employee as defined by FLSA, 29 U.S.C. § 203(e) and NYLL § 190; and is not exempt by FLSA, 29 U.S.C. § 213.

91. Plaintiff SILVA was hired as a housekeeping employee for JETSET in or about June 2017 by Manager Paris.

92. At various times Plaintiff SILVA performed work not only at JETSET but also at METRO SUITES HOTEL.

93. At all times Plaintiff SILVA's pay for work performed at both hotels was paid together, including in a single check when she was paid by check, and Plaintiff Silva was assigned to work at both hotels by individual Defendants and their agents.

94. Plaintiff SILVA's first week of "training" consisted of five 8-hour days and was unpaid.

14

95. Thereafter Plaintiff SILVA was paid $9.00 per hour in cash for the next 6 months until January 2018. From January 2018 to December 2019, she was paid a straight time rate of $10.00/hour. For the years of 2020 -2021, she received a straight time rate of $11.00/hour /hour.

96. That is, at no time was Plaintiff SILVA paid minimum wage.

97. Plaintiff SILVA's  regular schedule was from Monday through Friday 11:00pm to 7:00am, not including her floating shifts.

98. Plaintiff SILVA's two floating eight-hour shifts were spread out randomly over the week and paid in cash at a straight time rate of the employee Plaintiff SILVA was covering.

99. That is, if the worker who was seeking coverage was paid at the discriminatory and illegal sub-minimum wage rate reserved for immigrant workers, Plaintiff SILVA would be paid the same rate.

100. At no time was Plaintiff SILVA paid overtime and at no time were her 16 hours worked in excess of 40 hours per week reflected on Plaintiff SILVA's pay stub.

101. At all times relevant, when Plaintiff SILVA was paid by check, she was paid at a straight time hourly rate by check up to 40 hours, and in cash for her additional 16 hours worked weekly.

102. That is, at all times relevant, Plaintiff SILVA's pay stubs did not reflect her total number of hours worked.

## COMMON DISCRIMINATION ALLEGATIONS

### Defendant's Systemic Discrimination Against Indigenous Mexicans/or because of their Perceived Immigrant Status

103. The following allegations are common to all Plaintiffs and operative as to all Plaintiffs alleging discrimination claims within the relevant period, as indicated in the counts, *infra*.

104. Within days of becoming employed with Defendants, each Plaintiff realized that because of their protected status as perceived immigrants and/or indigenous Mexican workers they were being subjected to wage theft, harassment and abuse. As described below, at all times relevant, all Plaintiffs were subject to such hostile work environment because of their protected status.

105. Defendant's practices and personnel policies thus discriminate against Plaintiffs as indigenous Mexicans and/or perceived immigrants.

106. That is, Defendants maintains a system that systematically discriminates against indigenous Mexicans and/or perceived immigrants by stealing their compensation and, moreover, subjecting them to harassment because of their protected status.

### Defendant's Hostile Work Environment Because of Perceived Immigration Status/National Origin

107. Upon hire, Plaintiffs were explicitly told by Management that there was a week of non-paid work and that thereafter because of their protected status they would be paid below minimum wage because they were just "immigrants".

108. At all times relevant, Defendants paid Plaintiffs straight time wages for all overtime hours worked, in cash, and at the wages reserved for "immigrant workers". That is, Plaintiffs were paid sub-minimum wages at a straight time rate for any and all overtime hours worked.

16

109. Defendants devaluing of Plaintiffs was not only in terms of pay but also in seeing their lives as less valuable than non-immigrant indigenous Mexican workers.  As hotel housekeepers, Plaintiffs understood that their jobs were not for the faint of heart. Plaintiffs took pride in their jobs.  They would have to make beds, replace used towels with new towels, vacuum carpets, clean and disinfect bathrooms, clean windows, empty trash, launder linens (when the laundry machine worked), clean and dust the furniture etc., and do the same for the public areas as well. There was never a moment of rest, when they were done with those tasks they would be sent to their neighboring hotels to do the same. If it was snowing outside, they would be directed to remove snow.

110. However, it was how Plaintiffs were treated by Management and their failure to protect them from known dangers in the workplace whether it a dangerous known hazard like a broken elevator to the more egregious violent outbursts of Defendants' clientele that Plaintiffs truly knew what Defendants thought of them because of their protected status.

111. Plaintiffs allege that Management knew of the malfunctioning elevators but directed Plaintiffs to use them anyway. Plaintiff SAAVEDRA recalls being stuck in the elevator with another colleague. She recalls that they were both incredibly frightened that the elevator would fall. It seemed to Plaintiff SAAVEDRA that the elevator was "moving side to side, like a swing. We were out of breath. I felt like I was going to faint. When we called Management they told us not to ever push the emergency button or we would be in trouble. Sometimes when we would get stuck – we would wait for a very long time for someone to arrive from another hotel to help us." Plaintiff Lucero recalls being stuck for two hours and another timed for thirty minutes.

112. At all times during the relevant period, on a daily basis, Plaintiffs were routinely stalked by Management who would snap their fingers behind them as they worked, told to work harder, faster, without breaks and for sub-poverty wages.

113. Plaintiffs further allege that they were subjected to unhealthy and incredibly unsafe working conditions, which include but are not limited to: continuously being forced to ride in malfunctioning elevators[8] an incredibly dangerous issue known to Management; being exposed to bloodborne pathogens and other potentially infectious materials including bodily fluids, crack pipes, used drug needles and other drug paraphernalia; subjected to bed bugs with no working laundry to deal with such infestations, being denied PPE (even during the pandemic) with no guidance for workplace injury and illness prevention and response.

114. Plaintiffs report being penalized for advocating for safer working conditions. Plaintiff SAAVEDRA, described the retaliatory firing she faced on or about June 2021 when raising safety concerns and was compelled to call 911 for an employee who had toxic cleaning chemicals in her eyes only to be harassed and then fired for her advocacy for this worker.

115. But it was the constant abuse and harassment by defendants and their clientele that made clear that fear and threats to Plaintiffs physical and emotional safety was a term and condition of their job.

116. Upon information and belief, Defendants are allegedly dependent on a clientele who use their hotel rooms to engage in illicit activities including drug use, and prostitution, where violence against women is rampant and threats to our clients' physical and emotional well-being is the norm.   A Trip Advisor member described his experience with Defendants in a public post where he warned unassuming tourists not to book rooms with Defendants:

---

[8] During the time Plaintiffs worked for Defendants there were at least 8 NYC Department of Building violations for elevator issues and a long list of other miscellaneous DOB violations filed against the same.

"WARNING - This is a prostitution flop house. They offer hourly rates and have a cash only policy. Absolutely disgusting lobby. I never made it to the room as I walked out when I learned of the policies. AVOID THIS HOTEL AND NEIGHBORHOOD."

117. All Plaintiffs report that they had to get "used to feeling in danger" as the customer base would threaten physical abuse and call them degrading and racist names with no help from Defendants. All Plaintiffs report at one point or another, fear of being raped at work.  Plaintiff SAAVEDRA described carrying spray bottles containing bleach so that she could use it as a weapon if necessary.

118. Although Defendants were in the best position to adopt a protocol that could prevent unsafe interactions between hotel staff and their unpredictable clientele, but instead Defendants placed Plaintiffs directly in unsafe situations and refused to intervene nor protect them when in obvious danger.

119. Management consistently directed Plaintiffs to enter rooms known to be occupied with late leaving male customers to rush the occupant to leave, thus putting them in direct danger of physical and verbal harassment.  Plaintiff SAAVEDRA recalls being threatened with a stick by one hotel customer. Plaintiff SILVA reported to Defendant P. CHADHA that a customer threatened her with a knife, and although there is a bodyguard monitoring the hotel, defendant P. CHADHA simply told Plaintiff SILVA to deal with it herself.

120. All Plaintiffs report several incidents of naked male hotel patrons cornering them in rooms requesting sexual services for money.  Plaintiff LUCERO recalled a frighting episode where a male patron burst through a door that connected the room she was cleaning to an occupied hotel room. He cornered her in a room, was verbally threatening and tried to physically grab her.

121. Requiring Plaintiffs to do this created a hostile and dangerous work environment. The relentless harassment combined with the extreme danger and hazardous work conditions our clients were routinely subjected to not only humiliated them, but also put them in a constant state of fear of rape, bodily harm and/or death, from hotel patrons and Defendants utterly failed to protect them

122. Adding insult to injury, Plaintiffs report that they were under constant surveillance – as their every move was recorded by video cameras, forbidden to take rest breaks or to use a bathroom only available to hotel clerical staff and reprimanded if they did.    Plaintiffs reported that, to avoid punishment from management, and with no bathroom to access, a non-party coworker of hers was forced to urinate in a bucket when no one was looking.   Management continually told them to "work harder, work faster" through verbal commands and WhatsApp group chat messages.  To Plaintiffs these messages confirmed they were being watched at all times. Although when Plaintiffs faced physical threats and sexual and racial harassment from this same clientele, Defendants looked away.

123. In fact, Plaintiffs were treated as if they were the criminals. Plaintiffs' personal belongings were searched at the end of the day to calm management's irrational fears that Plaintiffs were stealing from Defendants!

124. Unsurprising but still shocking, at least one Plaintiff was directed to get into the car with a Manager she was not very familiar with named Danny to be taken to who she thought might be the Chadha's father's house to clean his private home. This scared Plaintiff ROJAS as she did not know where they were going, and she would be left there on her own without transportation home. To Plaintiff ROJAS it felt like she was being trafficked into homes to do labor without being paid. She was constantly told that if she did not get into the car and

go with them that she could look for another job. This type of messaging was consistent, and anytime workers raised concerns or wanted to discuss their terms and conditions of employment they were met with a take it or get fired attitude.

125. Signs left around the hotel also repeated such mantras. One sign left next to the schedule read: "The meeting will be on March 9 at 12:00 noon. If you don't like the date you can go to the office and say you don't like the date and you can quit if you can't wait."

126. Defendants, by all of such aforementioned acts, engaged in intentional discrimination, willfully paid Plaintiffs unlawfully, and subjected them to disparate rules and pay because of Plaintiffs' protected status.

127. Defendants thus have caused Plaintiffs to suffer substantial economic and non-economic damages, severe mental anguish, emotional distress, and further such acts warrant an award of punitive damages.

128. Although Defendants possessed full knowledge of the discriminatory, unsafe working environment, and unfair labor and wage practices, no actions were taken to report or remedy or to comply with discrimination and wage laws.

129. Plaintiffs were subjected to offensive, sexist and racist epithets by their direct supervisors and their clientele.  Plaintiff SAAVEDRA was continually called "gorda" ("fat") by Manager Harry and recalled that once he called her this offensive name while slapping her hard on her back – leaving Plaintiff to feel humiliated. Plaintiff SILVA stated, "Management felt so confident to touch us and hug us, it felt like they thought we were their property, they would force us to dance with them like we were dolls." Plaintiffs further recall at various times with the knowledge of Management, "that the clientele would threaten to call immigration on us, called us racist names, men would open the doors completely naked and

make threatening or sexual gestures, sometimes they would just slam the doors in our faces. It was scary. Management had a guard outside the hotel but would never help us. We would always ask for help and help never came. They condoned what was happening because they thought so little about us because of what they thought about Mexican immigrants. They didn't care to protect us."

130. Plaintiffs were subjected to such intimidation, ridicule, name calling, and taunts, and threats to their bodies because of their National Origin and/or perceived and/or actual immigrant status.

131. Thus, in the relevant period, from at least 2010 to the present, Defendants have maintained a continuing common practice of verbal abuse and harassment of indigenous Mexicans and/or perceived immigrant employees by Defendants' owners, supervisors, managers and other agents resulting in a hostile work environment for Defendants' indigenous Mexican immigrant employees. The names referenced above were addressed to Plaintiffs generally and each Plaintiff was called discriminatory epithets daily. Thus, all Plaintiffs have been called these humiliating names on an ongoing basis with such severity, duration and frequency as to establish a hostile working environment.

132. Plaintiffs were called epithets and experiences of physical menacing on a daily basis in the course of performing their employment. These epithets became such a regular part of the work that subjection to such names became a term and condition of Plaintiffs' employment.

133. The use of these terms was objectively offensive and intolerable and subjectively wounding and intolerable to Plaintiffs.

134. Such egregious theft of wages combined with the verbal abuse, harassment and unsafe working conditions is evidence of Defendant's animus against Plaintiffs as perceived immigrants and/or indigenous Mexican workers.

135. Because of this dehumanizing and humiliating treatment ESPECIALLY DURING A PANDEMIC, Plaintiffs became alienated from family, friends and lovers; suffered extreme depression, anxiety and other physical manifestations of stress.

136. All Plaintiffs continue to suffer egregious emotional distress as a result of Defendants' actions.

**FIRST CAUSE OF ACTION**
**(RACIAL DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK**
**ENVIRONMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS )**

137. Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

138. Defendants have discriminated against Plaintiffs on the basis of their being Hispanic in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjecting them to racially hostile treatment including but not limited to subjecting them to egregious wage-theft akin to slave labor, racially charged epithets, dangerous and unsafe working conditions during a Pandemic, and indifference to their injuries in part because of their Hispanic race.

139. All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

140. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, and for this they are entitled to an award of monetary damages and other relief.

141. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(PERCIEVED IMMIGRATION STATUS DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK ENVIRONMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)**

142. Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

143. Defendants have discriminated against Plaintiffs on the basis of their perceived immigration status in violation of the NYCHRL by subjecting Plaintiffs to a hostile treatment including but not limited to subjecting them to egregious wage-theft akin to slave labor, racially charged epithets, dangerous and unsafe working conditions during a Pandemic, and indifference to their injuries in part because of their perceived immigration status,

144. All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

145. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of monetary damages and other relief.

146. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, and for this they are entitled to an award of monetary damages and other relief.

147. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (NATIONAL ORIGIN DISCRIMINATION UNDER THE NYCHRL—HOSTILE WORK ENVIRONMENT AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS)

148. Plaintiffs hereby repeat and reallege each and every allegation in the preceding paragraphs as if set forth fully herein.

149. Defendants have discriminated against Plaintiffs on the basis of their Indigenous Guatemalan origin status in violation of the NYCHRL by subjecting Plaintiffs to a hostile work environment in the form of subjecting them to hostile treatment including but not limited to subjecting them to egregious wage-theft akin to slave labor, racially charged and degrading epithets, dangerous and unsafe working conditions during a Pandemic, and indifference to their injuries in part because of their National Origin.

150. All Defendants by their actions, including individual Defendants, have directly created, ratified, enforced or implemented the policies of disparate treatment.

151. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or

economic harm for which they are entitled to an award of monetary damages and other relief.

152. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this they are entitled to an award of monetary damages and other relief.

153. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYCHRL for which Plaintiffs are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(NEW YORK STATE MINIMUM WAGE ACT CLAIM- MINIMUM WAGE CLAIM, ARTICLE 19 NYLL §650 ET SEQ., BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AGAINST ALL DEFENDANTS)**

154. Plaintiffs, on behalf of themselves, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

155. Throughout the period covered by the applicable statute of limitations, Defendants knowingly paid Plaintiffs less than the minimum wage as required by NYLL and the supporting regulations of the New York State Department of Labor.

156. Defendants did not pay the minimum wage for all hours worked by Plaintiffs.

157. Defendants' failure to pay Plaintiffs the minimum wage was willful within the meaning of the NYLL.

158. Plaintiffs seek to recover their unpaid compensation, liquidated damages pursuant to NYLL, Article 6, § 198, attorneys fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (NEW YORK STATE MINIMUM WAGE ACT CLAIM—OVERTIME CLAIM, NYLL §650 ET SEQ., BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AGAINST ALL DEFENDANTS)

159. Plaintiffs, on behalf of themselves, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

160. Throughout the period covered by the applicable statute of limitations, Defendants willfully and repeatedly failed to pay Plaintiffs the overtime rate for hours worked in excess of forty (40) hours per workweek as required by NYLL, paying Plaintiffs straight time for all hours worked or nothing at all.

161. Plaintiffs are entitled to recover their respective unpaid compensation, damages pursuant to NYLL, Article 6, § 198, attorneys fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

162. Plaintiffs have been damaged in an amount as yet determined, plus liquidated damages.

## SIXTH CAUSE OF ACTION
### (NOTICE-AND-RECORDKEEPING REQUIREMENTS, NYLL §195 (3), BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AGAINST ALL DEFENDANTS)

163. Plaintiffs, on behalf of themselves, repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

164. Defendants have failed to provide Plaintiffs with wage statements or explanations of how their wages were calculated in violation of NYLL § 195(3).

165. Plaintiffs have been damaged in an amount as yet determined, plus liquidated damages.

## SEVENTH CAUSE OF ACTION
## (NOTICE-AND-RECORDKEEPING REQUIREMENTS, NYLL §195 (1), BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES AGAINST ALL DEFENDANTS)

166. Plaintiffs, on behalf of themselves, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

167. Defendants have failed to provide Plaintiffs and similarly situated persons with wage notices at the time of hire and thereafter at every time the statutory minimum wage increased in violation of NYLL § 195(1).

168. Plaintiffs have been damaged in an amount as yet determined, plus liquidated damages

## EIGHTH CAUSE OF ACTION

## (FLSA MINIMUM WAGE CLAIM, 29 U.S.C. §§ 201 et seq., BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES)

169. Plaintiffs, on behalf of themselves, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

170. At all times relevant, each Defendant has been, and/or continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of FLSA, 29 U.S.C. § 203.

171. At all times relevant, Defendants employed Plaintiffs as "employees" within the meaning of FLSA, 29 U.S.C. § 203.

172. Defendants were required to pay Plaintiffs at a rate not less than the minimum wage rate under the FLSA for all hours worked.

173. Defendants knowingly failed to pay Plaintiffs the required minimum wage under the FLSA for each hour worked for their unpaid training hours.

174. Plaintiffs, on behalf of themselves, seek damages for their unpaid compensation, liquidated damages as provided by the FLSA, attorneys' fees and costs, along with such other relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION

## (FLSA OVERTIME CLAIM, 29 U.S.C. §§ 201 et seq., BROUGHT BY PLAINTIFFS ON BEHALF OF THEMSELVES)

175. Plaintiffs, on behalf of themselves, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

176. Throughout the period covered by the applicable statute of limitations and upon information and belief, Plaintiffs regularly worked in excess of forty (40) hours per workweek.

177. At all times relevant, and upon information and belief, Defendants have repeatedly and willfully failed to pay Plaintiffs in accordance with the overtime provisions of the FLSA for work performed in excess of forty (40) hours per workweek.

178. Plaintiffs, on behalf of themselves, seek and are entitled to recover damages for their unpaid overtime compensation, liquidated damages as provided by the FLSA, attorneys' fees and costs along with such other relief as this Court deems just and proper.

179.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs request relief as follows:

A. An order declaring that the actions of Defendants alleged in this complaint violate NYCHRL;

B.  An award of compensatory damages in an amount that would fully compensate Plaintiffs, plus prejudgment interest, for the economic loss in the form of back pay and front pay, mental anguish, emotional pain and suffering, humiliation, embarrassment, emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life and interference with life's daily activities as well as continued stress and anxiety caused by Defendants' violations of the law alleged in this complaint, in an amount to be determined at trial;

C.  An award of punitive damages to Plaintiff in an amount that would punish Defendants for the willful, wanton, reckless misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial;

D.  An order declaring that Defendants violated the NYLL in the manners stated in this complaint;

E.  An order declaring that Defendants' violations of the NYLL and FLSA were willful;

F.  An award of minimum wage compensation under the NYLL and FLSA;

G.  An award of overtime compensation under the NYLL and FLSA;

H.  An award of liquidated damages pursuant to the NYLL and FLSA;

I.  All penalties available under the applicable laws;

J.  Attorneys' fees pursuant to 29 U.S.C. §216, NYLL §663 and all other applicable statutes;

K.  Interest as provided by law;

L.  An award of reasonable attorneys' fees, the fees and costs of experts, and the costs of this action; and

M.  Such other relief as this Court deems just and proper.

**JURY TRIAL**

Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a jury trial.

Dated: New York, New York
       July 18, 2022

                                        Respectfully submitted,
                                        _____/s/_____
                                        Kristina Mazzocchi, Esq.